IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : CASE NO.: 3:08-CR-302-J-LSC-JEG |
| | : CASE NO.: 3:13-CR-177-LSC-JEG |
| AARON MARCUS RICHARDSON | : |

## ORDER

Let a copy of this Report and Recommendation be served upon the parties. The parties will be allowed fourteen (14) days from the date of service of this Report and Recommendation to file objections. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2). If no objections are made, this Report and Recommendation will be adopted as a record of the proceedings and may become the opinion and order of the Court. <u>Devine v. Prison Health Services, Inc.</u>, 212 F. App'x 890, 892 (11th Cir. 2006).

All requests for additional time to file any objections to this Report and Recommendation should be filed with the Clerk for consideration by the undersigned.

The Clerk of Court is directed to submit the Report and Recommendation with objections, if any, on or before the ___1st___ day of ___December___, 2014.

SO ORDERED, this ___12th___ day of November, 2014.

_____
JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

v.                       CASE NO.: 3:08-CR-302-J-LSC-JEG
                         CASE NO.: 3:13-CR-177-LSC-JEG

AARON MARCUS RICHARDSON

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

By Orders dated October 29, 2014, the undersigned concluded that Defendant Aaron Richardson ("Defendant") should be medicated involuntarily to assist the Government's ability to prosecute Case Number CR313-177 and the revocation proceedings in Case Number CR308-302. (CR313-177, Doc. No. 40; CR308-302, Doc. No. 220). The undersigned entered his findings and conclusions of law as an Order of the Court. After due consideration, it appears that the undersigned's findings and conclusions of law might have been more appropriately presented by way of a Report and Recommendation.[1] Accordingly, the Orders dated October 29, 2014, are **VACATED**. The undersigned enters the following Report and Recommendation in the

---

[1] The undersigned enters this Report and Recommendation to be consistent with one entered by Thomas Morris, a magistrate judge in the Middle District of Florida. Magistrate Judge Morris noted, "[b]ecause of the significant liberty interest at stake, the undersigned agrees with the reasoning of the Ninth Circuit [Court of Appeals] in United States v. Rivera-Guerrero, 377 F.3d 1064, 1070 (9th Cir. 2004)[,] and finds that under the Federal Magistrate Act, 18 U.S.C. § 636, the filing of a Report and Recommendation to the District Court is the preferred method of proceeding if the magistrate judge has conducted evidentiary and testimonial hearings on whether a pretrial detainee should be forced to accept antipsychotic medication that is substantially likely to return him to a state of competence." United States v. Milliken, No. 3:05-CR-6-J-32TEM, 2006 WL 2945957, *1 n.2 (M.D. Fla. July 12, 2006).

AO 72A
(Rev. 8/82)

stead of the Orders dated October 29, 2014, in Case Number CR313-177 and in Case Number CR308-302.

## STATEMENT OF FACTS

In Case Number CR308-302, Defendant is accused of violation of a probation sentence imposed by this Court. In Case Number CR313-177, Defendant is charged with: attempted murder of a United States District Judge, in violation of 18 U.S.C. §§ 1113, 1114, and 3147(1); using, carrying, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 3147(1); possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 3147(1); possession of a stolen firearm and ammunition, in violation of 18 U.S.C. §§ 922(j), 924(a)(2), and 3147(1); providing false statements to the Federal Bureau of Investigation, in violation of 18 U.S.C. § 1001 and 3147(1); theft of a firearm from a federally licensed firearms dealer, in violation of 18 U.S.C. §§ 922(u), 924(i)(1), and 3147(1); failure to appear for a court hearing, in violation of 18 U.S.C. §§ 3146 and 3147(1); providing false statements to the United States Probation Office while on release in Case Number 3:08-cr-302-J-32TEM, in violation of 18 U.S.C. §§ 1001 and 3147(1); and falsely impersonating an officer of the United States, in violation of 18 U.S.C. § 912. (Doc. No. 1). The undersigned appointed John J. Ossick, Jr., to represent Defendant in these cases. Defendant's prior counsel filed an unopposed motion for competency examination in the revocation proceedings. (3:08-cr-302, Doc. No. 185). The undersigned granted this motion by Order dated July 13, 2013. (Id. at Doc. No. 186). The undersigned also ordered that Defendant undergo a competency examination in Case Number 3:13-cr-177-LSC-JEG. (Doc. No. 14). After receipt of the

report of Dr. Lisa Feldman, a forensic psychologist for the Bureau of Prisons, the Honorable L. Scott Coogler found, by a preponderance of the evidence, that Defendant is presently suffering from a mental disease or defect which renders him mentally incompetent "to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (Doc. No. 22, p. 2). Judge Coogler ordered that Defendant be committed to the custody of the Attorney General for hospitalization for treatment for a period of time not to exceed four (4) months to determine whether Defendant could attain the capacity to allow the proceedings against him to move forward. (Id.). Defendant was taken to the Federal Medical Center in Butner, North Carolina, where he was evaluated by, *inter alia*, staff psychologist, Maureen Reardon, Ph.D., and staff psychiatrist, Sarah Ralston, M.D. (Doc. No. 26, p. 2). An administrative hearing was conducted pursuant to Washington v. Harper, 494 U.S. 210 (1990), on July 7, 2014.[2] The administrative hearing officer concluded that Defendant did not meet the criteria for involuntary treatment on the basis of a grave disability or dangerousness to himself or others in his housing unit. (Forensic Evaluation, p. 10). Based on Reardon's and Ralston's report, the United States of America moved to have the undersigned conduct a hearing pursuant to Sell v. United States, 539 U.S. 166 (2003), to determine whether the involuntary medicating of Defendant can restore his competency to stand trial.[3] The United States of America

---

[2] Harper involved the question of the administration of antipsychotic drugs involuntarily to a mentally ill inmate and due process concerns as a result. The United States Supreme Court determined that the due process clause permits the State to treat an inmate who has a serious mental illness with antipsychotic drugs against his will if the inmate is a danger to himself or other and the treatment is in the inmate's best interest. 494 U.S. at 221–25.

[3] The Sell decision indicates that a magistrate judge in the Eastern District of Missouri entered an order on whether the defendant should be medicated involuntarily. Sell, 539 US at 171, 173-74. The undersigned's understanding of the Sell decision and the procedural history of this case is bolstered by a

3

also moved, in the event the Court determines that involuntary administration of anti-psychotic medications is warranted, that Defendant be transferred to the custody of the Attorney General for an additional period of time until Defendant's mental condition improves so that a trial may commence. (Id. at p. 3). The undersigned conducted a Sell hearing on October 7, 2014, at which Defendant and his counsel were present, and Reardon and Ralston appeared and testified.

## DISCUSSION AND CITATION TO AUTHORITY

In Sell, the United States Supreme Court determined that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." 539 U.S. at 179. "This standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances." Id. at 180. These standards for ordering the involuntary administration of drugs for trial competency purposes are as follows. "First, a court must find that *important* governmental interests are at stake." Id. (emphasis in original). "Second, the court must concluded that involuntary medication will *significantly further* those concomitant state interests." Id. at 181 (emphasis in original). "Third, the court must conclude that involuntary medication is *necessary* to further those interests." Id. (emphasis in original). Finally, "the court must conclude that administration of the drugs is *medically*

---

review of the Eastern District of Missouri's docket. See United States v. Sell, (E.D. MO.), (CR4:98-CR-177-CAS, Doc. Nos. 227, 230, and 269.)

4

*appropriate, i.e.*, in the patient's best interest in light of his medical condition." Id. (emphasis in original). The Government "bears the burden of proof on factual questions by clear and convincing evidence." United States v. Diaz, 630 F.3d 1314, 1331 (11th Cir. 2011).

I. **Important governmental interests**

Defendant, through counsel, stipulated to there being important governmental interests at stake in these cases. Thus, the undersigned need not address this prong of Sell, other than to note that Defendant is being charged with serious crimes, and he faces the potential of a substantial period of incarceration.

II. **Furtherance of state interests**

The second prong of the Sell test requires a court to "consider and determine two underlying factual questions: (1) whether medication is substantially likely to render the defendant competent to stand trial, and (2) whether the medication is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Diaz, 630 F.3d at 1332 (internal punctuation and citation omitted).

Reardon testified that she co-authored an article regarding every person who was involuntarily medicated under Sell across Bureau of Prisons' facilities from 2003 to 2009. Reardon stated that, of the 287 requests made, 132 were granted. Of the 132 requests which were granted, Reardon testified that 79% of the people were restored to competency, and all were treated with anti-psychotic medications. (Hrg. Tr., p. 10). Ralston testified that, of those people who were restored to competency with schizophrenia, 76.5% were restored. (Id. at p. 53). Ralston also testified that the

5

clinical practice guidelines from the American Psychiatric Association suggest that 70% of people treated with anti-psychotic medications have a partial to a full response to the medications. (Id.). Reardon also testified that Defendant was previously deemed incompetent to stand trial and was sent to the Butner facility for the restoration of his competency to stand trial. (Id. at pp. 13–14). Reardon noted that Defendant was restored to competency using the medication Abilify, which is an "excellent indicator" that he will respond favorably to this medication this time. (Id. at pp. 17, 25). Reardon also noted that the primary treatment for people with Defendant's condition (schizophrenia) is the administration of anti-psychotic medications. Ralston testified that it is very likely that Defendant will become competent again if he were medicated, citing the facts that Defendant responded well to Abilify before, was restored to competency, stopped taking Abilify, and returned to a state of non-competence. (Id. at p. 54).

Ralston also testified that, in her opinion, medicating Defendant would not significantly interfere with his ability to assist counsel with his defense. Ralston declared that Defendant was taking Risperadol during his previous period of competency restoration and complained about feeling sedated on this medication, so he was switched to Abilify. Ralston stated that Defendant did not report any major side effects from taking Abilify in 2010. Ralston noted that, even if Defendant suffers from any side effects this time, medical staff have treatments available to address any side effects which will not impair his competency. (Id.).

### III. Necessity of medication to further state interests

A district court determining whether involuntary medication is necessary to further the government's interests "must (1) find any alternative, less intrusive treatments are unlikely to achieve substantially the same results, and (2) consider less intrusive means for administering the drugs[.]" Diaz, 630 F.3d at 1334–35 (internal punctuation and citation omitted).

#### A. Alternative treatments

Reardon noted that Defendant was afforded alternative therapies, such as psychosocial interventions, during his first Sell proceedings, and these therapies had some success. (Hrg. Tr., p. 30). However, Reardon testified that these alternative therapies were not employed this time because "of the severity and the rigidity by which [Defendant] holds his delusional beliefs." (Id.). Reardon also testified that Defendant was housed in general population during his first Sell proceedings, whereas he is currently in the most restrictive housing unit to ensure that he will not attempt to escape or to fashion a weapon. Reardon stated that Defendant showed to her that he was not open to discuss his situation, which indicates to her that it would not be appropriate to engage in talk therapy. (Id. at p. 31). The reason Reardon opined that talk therapy (an ability to discuss beliefs) would not work with Defendant is because his schizophrenia is so severe that he is unable to acknowledge other people's beliefs or engage in any sort of dialogue with others. (Id. at p. 27). Reardon noted that she considered neuropsychological testing but chose not to pursue it with Defendant because there is no indication that Defendant suffered a head injury, which was ruled out as a cause of

7

his mental health condition, after an MRI was performed. (Id. at p. 43). Reardon testified that there is no sign of cognitive impairment on Defendant's part. (Id. at p. 44).

### B. Less intrusive means

Reardon and Ralston both testified that Defendant has not been compliant with taking his Abilify in pill or liquid forms. (Id. at pp. 22, 59). Reardon stated that, although Defendant initially agreed to take his medication in pill form, it then appeared that he was not taking it consistently or was faking having taken it because there was no detectable improvement of his condition. In fact, Reardon testified that Defendant was "savvy" in how he was not compliant with voluntarily taking his medication, such as asking to take the medication at night when he thought the oversight for compliance might be less intense than during the day. (Id. at p. 23). Reardon also noted that one nurse was "particularly observant" of Defendant's compliance with his medication, and it was during her shifts that he would refuse to comply with a mouth check for a pill or would "accidentally" spill the liquid medication. (Id. at pp. 22, 24). Reardon noted that Defendant has been unwilling to submit to having his blood tested so that it can not be determined what level, if any, of medication is actually in his system. Defendant will not agree to take an injectable form of Abilify, so medical staff discontinued his medication, which is the only way, in Reardon's opinion, that Defendant can be treated. (Id.). Ralston noted that Defendant would come up with a reason not to take his medication orally, even after he was switched to the liquid form, such as his stomach hurt, he was tired, or he simply did not want to take the medication. (Id. at p. 58). Ralston opined that giving Defendant the injectable form of Abilify once a month would be the best and only way to ensure Defendant receives his medication given the difficulty in ascertaining

8

and assuring his compliance with taking the oral versions of this medication. (Id. at p. 57).

## IV. Whether the medication is medically appropriate

The administration of medication involuntarily must be "*medically appropriate, i.e.,* in the patient's best interest in light of his medical condition." Sell, 539 U.S. at 181. Ralston opined that giving Defendant Abilify involuntarily is necessary and medically appropriate to restore his competency to stand trial. Ralston stated that the American Psychiatric Association's clinical practice guidelines suggest that the first line of treatment for schizophrenics is antipsychotic medications. (Hrg. Tr., p. 70). Ralston noted that, without appropriate treatment, schizophrenics can neglect self care and accessing medical care, and that in Defendant's case, medication would allow him to avoid the disciplinary problems he is having and have greater freedom in the facility than he currently has. Ralston observed that Defendant complained of having "gastrointestinal discomfort" when he did take the oral forms of Abilify, and this discomfort would be eliminated by administering the injectable form to Defendant. (Id. at p. 62). Ralston also observed that Defendant is at a lower risk for metabolic side effects, such as weight gain and higher serum cholesterol and sugar levels, because he exercises regularly. (Id. at p. 66). Ralston testified that these levels would be monitored on a regular basis. Ralston also testified that Defendant did not experience neuromuscular side effects, such as muscle rigidity and restlessness, the first time he was on Abilify, but if he experienced these side effects, other medication could be administered to reverse those side effects. (Id. at p. 64). Ralston also testified that medical staff at Butner have evaluated Defendant, and there are no "significant

underlying medical problems" with Defendant. (Id. at p. 71). Ralston stated that, given Defendant's past success with Abilify, he would be monitored regularly and, as long as he was doing well while on the medication, mental health staff would visit him quarterly. (Id. at p. 81).

## V. Conclusion

Based on the foregoing, it is my **RECOMMENDATION** that the Court find by clear and convincing evidence that: 1) Defendant should be involuntarily administered an injectable form of medication in an effort to restore his competency; 2) the Government has important interests in prosecuting Defendant for the alleged commission of several serious crimes; 3) Defendant has shown his unwillingness to take his medication voluntarily in either oral or intravenous forms; 4) the medicating of Defendant involuntarily will assist the Government's ability to prosecute Case Number CR313-177 and the revocation proceedings in Case Number CR308-302; 5) the proposed treatment is medically appropriate; 6) Defendant is unwilling to comply with less intrusive means, which means that Defendant's medication should be involuntarily administered in an injectable form; and 7) Defendant be remanded to the custody of the Attorney General for a period of 120 days in an effort to restore his competency.

SO ORDERED and REPORTED and RECOMMENDED, this 12th day of November, 2014.

_____
JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

10

AO 72A
(Rev. 8/82)